OGDEN v. REDDISH et al.

(District Court, E. D. Kentucky. August 27, 1912.)

1. FRAUDULENT CONVEYANCES (§ 122*)—MORTGAGES—EXISTING INDEBTEDNESS.
   A mortgage made by a debtor to his creditor in good faith to secure a then existing indebtedness is not fraudulent because the debtor is then insolvent and the mortgage may operate to give the creditor a preference.
   [Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 392–398; Dec. Dig. § 122.*]

2. BANKRUPTCY (§ 159*)—PREFERENCES—MORTGAGES—EXECUTION.
   Where a mortgage was executed by a bankrupt to his creditor subsequent to June 25, 1910, the question whether it was a voidable preference was governed by Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (U. S. Comp. St. Supp. 1911, p. 1506).
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247–281; Dec. Dig. § 159.*]

3. BANKRUPTCY (§ 166*)—"VOIDABLE PREFERENCE"—REQUISITES.
   In order that a mortgage executed by a bankrupt to a creditor shall constitute a "voidable preference," as defined by Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (U. S. Comp. St. Supp. 1911, p. 1506), the bankrupt must have been insolvent, the mortgage must have operated as a preference, and the mortgagee, or his agent acting for him, or recording the mortgage, must have had reasonable cause to believe that the mortgage would effect a preference either at the time of making or recording the mortgage.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

4. BANKRUPTCY (§ 160*)—VOIDABLE PREFERENCES—"INSOLVENCY."
   A bankrupt was "insolvent" at the time he executed a mortgage claimed to be a voidable preference, if the aggregate of his property at a fair valuation was not sufficient in amount to pay his debts.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 249–258; Dec. Dig. § 160.*
   For other definitions, see Words and Phrases, vol. 4, pp. 3647–3655; vol. 8, p. 7689.]

5. BANKRUPTCY (§ 166*)—VOIDABLE PREFERENCE—"EFFECT A PREFERENCE"—"OPERATE AS PREFERENCE."
   Where a mortgagee of a bankrupt had reasonable cause to believe that the mortgage would "effect a preference," it had reasonable cause to be-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

lieve that it would "operate as a preference"; such terms, as used in the bankruptcy act, being synonymous.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

6. BANKRUPTCY (§ 303*)—VOIDABLE PREFERENCE—BURDEN OF PROOF.

Where a bankrupt's trustee sued to set aside a mortgage executed by the bankrupt to one of his creditors as a preference under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), the burden was on the trustee to show, not only that the bankrupt was insolvent and that the mortgage covered such percentage of the bankrupt's property as to operate as a preference, but that the mortgagee had reasonable cause to believe both such facts.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 452–462; Dec. Dig. § 303.*]

7. BANKRUPTCY (§ 303*)—MORTGAGES—PREFERENCES—EVIDENCE.

In an action by a bankrupt's trustee to set aside a mortgage of certain property of the bankrupt to a creditor shortly before his failure, evidence *held* to require a finding that the bankrupt was insolvent when the mortgage was executed, that it operated as a preference, and that the mortgagees, prior to recording the mortgage, had reasonable cause to believe that the mortgagor was insolvent and that the mortgage would so operate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

In Equity. Action by E. L. Ogden, as trustee in bankruptcy of M. F. Reddish, against M. F. Reddish and the Daniel Briscoe Company, to avoid a real estate mortgage executed by the bankrupt and recorded by the creditor within four months prior to adjudication, on the ground that it was a voidable preference. Judgment for plaintiff.

C. L. Williamson, of Lexington, Ky., R. A. Chiles, of Mt. Sterling, Ky., and S. D. Rouse, of Covington, Ky., for plaintiff.

V. P. Smith, of Somerset, Ky., and Ernst, Cassatt & Cottle, of Cincinnati, Ohio, for defendant.

COCHRAN, District Judge. This cause is before me for final decree. It is a suit by the trustee in bankruptcy of M. F. Reddish to avoid a real estate mortgage made by the bankrupt to the defendant Daniel Briscoe Company, a corporation, which was both made and recorded within four months of the filing of the petition in bankruptcy. It was made September 7, 1910, lodged for record September 20, 1910, and recorded September 21, 1910. The petition in bankruptcy was filed October 21, 1910, adjudication had November 15, 1910, and the trustee elected January 10, 1911. This suit was brought June 2, 1911. The mortgage was made to secure a then existing indebtedness in the sum of $1,264.93.

[1] It is attacked on three distinct grounds, to wit: As a fraudulent transfer; as a voidable preferential transfer, under section 1910 of the Statutes of Kentucky; and as a voidable preferential transfer, under section 60b of the bankrupt act. It was not a fraudulent transfer, because it was made in good faith to secure a then existing indebtedness. Question is raised as to whether the attack on it upon the second ground did not come too late, inasmuch as section 1911 of Kentucky Statutes requires that an attack on a recordable preferential

transfer under section 1910 shall be made within six months after the transfer is lodged for record, and this suit was brought after the lapse of more than six months from the lodging for record of the mortgage thereby attacked. Without considering this question, I pass to a consideration of the question whether the mortgage was a voidable preferential transfer under section 60b of the bankrupt act.

[2,3] The mortgage having been made after June 25, 1910, when the amendment to section 60b was enacted, is governed thereby. According to it three things are essential in order that the mortgage be subject to avoidance thereunder: The bankrupt must have been insolvent; the mortgage must have operated as a preference; and the mortgagee, the defendant company, or its agent, acting for it in its making or recording, must have had reasonable cause to believe that the mortgage would effect a preference. These three things must have existed at either of two particular times, to wit: Either at the time of the making of the mortgage; or at the time of its recording. Though they may not have existed at the time of its making, it is sufficient if they existed at the time of its recording; and though they may not have existed at the time of its recording, it is sufficient if they existed at the time of its making. This, however, is not likely to occur. But it is not unlikely that they may not have existed at the time the mortgage was made and yet have existed at the time it was recorded.

[4] A word or two further may be said about these three essentials. Insolvency on the part of the bankrupt existed if the aggregate of his property at a fair valuation was not sufficient in amount to pay his debts. Section 1 (15), Bankrupt Act. The mortgage operated as a preference if the property covered by it was a greater percentage of the bankrupt's property than on a distribution thereof amongst his creditors would be received by his other creditors of the same class. If the property covered thereby was not such a greater percentage, it did not operate as a preference. 1 Loveland on Bankruptcy, p. 1016.

[5] Reasonable cause to believe that the mortgage would effect a preference was reasonable cause to believe that it would operate as a preference. Effect a preference and operate as a preference I understand to be the same thing. The requirement in terms is not that the mortgagee or his agent should have reasonable cause to believe that the bankrupt was insolvent and the mortgage would effect a preference, but only that it should have had reasonable cause to believe that the mortgage would effect a preference. Belief that the mortgage would effect a preference —i. e., that the property covered thereby was a greater percentage of the bankrupt's property than on a distribution thereof amongst his creditors would be received by his other creditors of the same class— necessarily involved belief that the bankrupt was insolvent, for not otherwise could the mortgagee have had such belief.

[6] The requirement, therefore, is not only that the bankrupt was insolvent and that the mortgage covered such greater percentage of his property, but that the defendant company, the mortgagee, had reasonable cause to believe both these things. It had such reasonable cause if it had that, the reasonable effect of having which was such a belief. To have such a thing was to know such a thing. The requirement, therefore, is that the mortgagee knew that, the reasonable effect of

knowing which was such belief. It seems to point to knowledge of something short of insolvency, and that the mortgage covered such greater percentage. And it would seem that, to comply therewith, it is not necessary that it appear just what the mortgagee knew. If he acted as if he so believed, the reasonable inference therefrom should be that he had the required knowledge, even though it may not appear just what that knowledge was. The burden was on'the plaintiff to establish each one of these three essentials.

[7] The bankrupt was a merchant selling dry goods and groceries at Somerset, Ky., and had been thus engaged for about 14 years. The defendant company was in the wholesale dry goods and notions business at Knoxville, Tenn., about 150 miles distant from Somerset, and had been since the early part of 1909. At the date of the mortgage, to wit, September 7, 1910, the bankrupt owed the defendant company the amount for which it was made, to wit, $1,264.93, for dry goods theretofore purchased. The bankrupt began doing business with it shortly after it opened; his first purchase being made July 31, 1909 and his last July 7, 1910. He purchased in all the amount of $2,426.05, on which he had made different payments, amounting in all to the sum of $1,186.33. The difference, $1,239.72, plus $25.21 on account of interest, gave the amount, to wit, $1,264.93, for which the mortgage was made. This interest charge was because of the fact that he had not been able to meet his obligations for purchases as they became due. Apparently as late as June 3, 1910, when the indebtedness of the bankrupt to the defendant company, including an order that day filled, amounted substantially to as much as it was when the mortgage was made, but when it was not as long overdue, it did not feel much apprehension as to his ability to pay. I gather this from such expressions as these, to wit, "We thank you for your esteemed order," and "With best wishes, and promising our best efforts to serve your interest at all times," contained in a letter from it to him of that date in relation to the order that day filled. The mortgage was made at the solicitation of the defendant company's president, Price, who made a visit to Somerset for that purpose. According to his testimony, the motive for soliciting the mortgage was this: The bankrupt had sent in an order for $200 worth of merchandise. The amount of his account then was as much as the defendant company thought he ought to owe. It felt that he had reached the limit of credit. It wished to fill the order, and that it might do so the mortgage was solicited. After the mortgage was made, the defendant company made two shipments of goods to bankrupt, one September 8, 1910, amounting to $135.64, and the other September 19, 1910, amounting to $84.91. The latter shipment was returned October 14, 1910. The testimony of the bankrupt is in conflict with Price as to its motive in soliciting the mortgage. He testified that at that time there was no outstanding unfilled order for goods on his part, and that the sole reason given by Price for wanting the mortgage was so defendant company could put it up in New York to borrow money on it, as all the dry goods companies had to put up collateral in the East. The fact that after the mortgage was made orders for goods were filled has no tendency to show when the

orders were made, and, therefore, favors neither side of this conflicting testimony.

At the time the mortgage was made the bankrupt was hopelessly insolvent. The bankrupt testified that his schedules show his liabilities and assets at the time the mortgage was made. He owed unsecured creditors including defendant company, $12,315.93, for taxes and rent $212.80, and secured real estate purchase-money lien $500, by real estate mortgage $1,000, and by lien on $1,000 par value of bank stock $500, or in all $14,528.73. His assets consisted of stock in trade $4,-125.55, $7,500 of accounts whose real value was placed at $1,000, real estate covered by purchase-money lien $750, real estate covered by mortgage $1,500, and bank stock $1,000, and the real estate mortgaged to the defendant company $1,500, amounting in all, nominally, to the sum of $16,375.55, or, if deduction of the difference between nominal and real value of the accounts and none other, is made, the sum of $9,875.55, which is the real value of the assets, apart from exempt property, made by the schedules. It is stipulated that the real estate mortgaged to defendant company was then worth $750, and that the trustee in bankruptcy declined to take charge of the real estate covered by the purchase-money lien and mortgage, because there was no equity in them. This calls for a deduction of at least $1,500 more, which, and if none other is made, reduces the value to $8,375.55. It should be noted that, though the bankrupt scheduled his stock in trade at $4,125.-55, he testified that at the time the mortgage was made the fair cash market value of his stock was between $6,000 and $8,000. The total amount realized otherwise than from the real estate came to $3,124.80, and the total dividend paid to general creditors was 16 per cent.

There can, therefore, be no question as to the correctness of the statement just made that at the time the mortgage was made the bankrupt was hopelessly insolvent. It is not contended otherwise. Price testified that at the time the mortgage was solicited and obtained he did not have any knowledge or information that the bankrupt was insolvent, and that it was not solicited and obtained with a view or intention of seeking an advantage or preference over other creditors of the bankrupt, and that it was asked in order that further credit might be extended to him. The defendant company had a stockholder and salesman, Lowenthal by name, who lived at Somerset, and who solicited from the bankrupt the orders for goods out of which the indebtedness had arisen, but who had nothing to do with soliciting and obtaining the mortgage. He testified that he had no knowledge or information that led him to believe that the bankrupt was insolvent when the mortgage was made, and that he always believed that he was good for what he bought, and always recommended him for any order. He thought he was all right and good pay. The attorney, Smith, who drew the mortgage, was a resident of Somerset, had right smart commercial practice, and represented a great many wholesale houses that sell goods to the merchants of Somerset. He testified that at the time the mortgage was made he did not have any knowledge or information that the bankrupt was insolvent, that he thought him to be "perfectly solvent," and that his general reputation as to solvency, honesty, and integrity as a merchant was "as good as any man in town," and that he had recommended credit to him by the defendant company to the

extent of $1,000. The bankrupt himself testified that at the time the mortgage was made the defendant company did not have any information from him, or from any one else to his knowledge, that he was insolvent or unable to meet his indebtedness, and he then believed that he was able to meet his indebtedness or obligations. His commercial rating was "G 3," which meant that he had a stock of $5,000 to $10,-000 and credit was good. His creditors were not then pressing him for settlement.

The defendant company, when it solicited and obtained the mortgage, made no effort—"no particular effort," as Price testified—to find out what the bankrupt's assets or liabilities were. No examination of his books or invoices was made. It does not appear even that a cursory examination of the stock of goods was made. No other inquiry was made of the bankrupt or any one else, except about his liabilities. Price testified that he asked some questions about his liabilities, and the bankrupt answered him in a general way, stating that they were about so much; the figures given not being remembered. The bankrupt testified that Price asked him whom he owed outside of the defendant company, and he told him, giving him the correct amounts he owed various people. He further said he told him who his chief creditors were. It is reasonable to conclude that defendant knew that the bankrupt owned other real estate than that mortgaged, which was incumbered. Smith examined the record to see whether the real estate to be mortgaged was incumbered. This would necessarily disclose the mortgage on other real estate. It might not disclose the purchase-money lien on the parcel subject to it. It is hardly likely, however, that inquiries as to the property to be mortgaged did not disclose what real estate he owned and its condition as to being incumbered or not.

The interview which resulted in the agreement for the mortgage lasted only about half an hour, and the defendant company then turned the matter of preparing and obtaining the execution of the mortgage and lodging it for record over to Smith. He was its agent, not only to prepare the mortgage and obtain its execution, but he was also intrusted with the mortgage after it was executed and with lodging it for record. It was withheld from record from September 7th to September 20th. Price testified that he could not tell why the mortgage was withheld from record, and that he was under the impression that it was recorded right away. Smith testified that there was some reason for withholding it, that it seemed the bankrupt wanted to pay some cash, that he did not remember and could not say why it was withheld, that he did not remember whether it was held up at request of the bankrupt, of defendant company's president, or why, but that some reason or excuse was given from one side or the other to him. After the making of the mortgage the bankrupt obtained some money from his brother in Pittsburgh to tide him over, and about the 20th of September he sent it back, because he did not want to put in his brother's money and lose it with the other. And on September 26, 1910, the bankrupt made an assignment to Smith, the defendant company's attorney, for the benefit of his creditors. This assignment, and possibly the making of the mortgage to defend-

ant company, were the acts of bankruptcy upon which the proceeding in bankruptcy, which was an involuntary one, was based.

Such, then, are the facts and testimony from which the question as to whether the mortgage should be avoided is to be determined. I think it is a statement thereof that is fair to the defendant company. It is clear therefrom that the bankrupt was insolvent, and that the mortgage operated as or effected a preference, both when it was made and when it was recorded. The case hangs, therefore, on the question whether the defendant company or Smith had reasonable cause to believe that it would operate as or effect a preference, either when made or when recorded. If it or he had such cause at either time, the mortgage cannot stand.

Counsel for plaintiff think that it is clearly made out that Smith had cause, when the mortgage was lodged for record and recorded, however it may have been when made, because of his testimony that his recollection was that on two days before the day of the making of the assignment the bankrupt spoke to him regarding it. Undoubtedly if this occurred—that is, if the bankrupt spoke to Smith about making the assignment, before he lodged the mortgage for record—it should be avoided. The fact that defendant company's attorney and agent had been so spoken to must be held to have been a reasonable cause to him to believe that the mortgage would operate as or effect a preference, and section 60b expressly provides that, if the agent of the transferee "acting therein"—i. e., in either the making or recording of the transfer—has the required reasonable cause it is sufficient. This no doubt would be the law, though not so expressly provided; but if the bankrupt only so spoke two days before the making of the assignment, he did not so speak before the mortgage was lodged for record or recorded. The assignment was made September 26th. Two days before would have been September 24th. The mortgage was lodged for record September 20th, and recorded September 21st. In some places in the record, however, it is by mistake stated that the assignment was made September 21st. Two days before that date would be September 19th, which would be before the mortgage was lodged for record. Counsel has not noticed that the statement, wherever it occurs, that the assignment was made September 21st is a mistake. But I am quite convinced that the bankrupt did in fact speak to Smith—i. e., consulted him—about making the assignment before the mortgage was lodged for record, notwithstanding at one place in his testimony he limits his recollection as to the time when the speaking took place to two days before the assignment was made, so much so that I feel constrained on this ground, if for no other, to avoid the mortgage.

As heretofore stated, the bankrupt, about September 20th, determined to return to his brother in Pittsburgh the money which he had advanced him after the making of the mortgage to enable him to tide over, because he had reached the conclusion that his failure was inevitable. It was on that day that Smith lodged the mortgage for record. I cannot avoid the conviction that he did this because he was then advised by the bankrupt that he would have to make an assignment. The bankrupt testified as a witness over 1 year and

3 months after September 20, 1910, about which date he said he returned the money to his brother, and on which date the mortgage was lodged for record. How did he happen to recollect the date about which he sent the money back, when unexpectedly asked about it on the stand? Is it not plausible to suggest that it was because of the fact that it was on that day the mortgage was recorded, of which he was advised at the time; the lodging of same for recording possibly being a subject of the conversation in which the making of the assignment was spoken about? When Smith was first asked on cross-examination as to the time when the bankrupt first talked to him about making the assignment, he did not limit his recollection to 2 days before it was made. He testified then that it was some time after the mortgage was given, and that it was within 30 days, but he could not tell whether it was 5 or 29 days. It was only when asked again about the matter that he limited it to 2 days before. The question then asked him was, not how long before the making of the assignment that the bankrupt consulted with him about it, but how long before September 21, 1910; the questioner no doubt assuming by mistake that that was the date when the assignment was made. It was in answer to this question that he testified that it was his recollection that the bankrupt spoke to him 2 days before the assignment.

There is, therefore, nothing in Smith's testimony which requires that we should place the time when the bankrupt spoke to him about making the assignment no earlier than 2 days before the assignment. Then why was the mortgage withheld from record until the 20th, and on that date lodged for record? The persons who ought to know have given no satisfactory explanation of this. And none whatever is given as to how it happened to come to be lodged for record on the 20th. As to why it was withheld from record at all, we know that it was not due to neglect. It was purposely withheld. The testimony of Smith was that it was withheld for some reason or excuse which he could not remember, but that it seemed to him that it was withheld because the bankrupt wanted to pay some cash. It is reasonable to infer from this that the mortgage was withheld in order that the bankrupt might get some cash from his brother to pay on the debt, in which contingency the mortgage was not to be put to record; that for this purpose he applied to and obtained from his brother some cash; that by the time he had done so he became aware that failure was inevitable; and that thereupon he returned the cash to his brother, notified Smith, and Smith at once put the mortgage to record. Then in a few days the bankrupt made the assignment to Smith. Not having been aided by those who would be expected to know why it was withheld, I have no other recourse than to infer the reason from all the circumstances in the case. No other occurs to me, and this reason fits the circumstances.

I am not content, however, to let the case go without also considering the question whether the defendant company had reasonable cause to believe that the mortgage would operate as a preference at the time it was made. In determining it I will put behind me the conclusion reached as to why the mortgage was withheld from record.

at all, and why it was lodged for record when it was, and treat the case as if it appeared that the mortgage was lodged for record immediately upon its execution. Of course, if it appears, independently of this, that it then had such cause, this consideration greatly strengthens the conclusion.

We are met here by the sweeping statements of Price, Smith, and Lowenthal that they then had no knowledge or information that the bankrupt was insolvent, and of the bankrupt that so far as he knew the defendant company had no such knowledge or information, from him or any one else, and by the motive assigned by Price for soliciting the mortgage, which was, as we heretofore have seen, not that defendant company was concerned about the then existing indebtedness, but in order that it might fill a $200 order then in hand and which it desired to fill, but which it could not fill because the bankrupt had reached its limit of unsecured credit. As to this motive for soliciting the mortgage, a proper weighing of the evidence does not justify the acceptance of this as the true motive therefor. Against such acceptance is the fact that the mortgage was taken, not to secure the amount of the new order, but the old debt, the circumstance that the soliciting and obtention thereof was not put in the hands of Lowenthal, defendant company's stockholder and salesman, who lived at Somerset and had solicited all the orders theretofore given by the bankrupt, but the matter was deemed of sufficient importance and urgency for Price, its president, to make a visit to Somerset for that special purpose, and the testimony of the bankrupt that there was then no outstanding unfilled order, and the only reason assigned by Price for wanting the mortgage was that it might be used as collateral in the East.

As to the sweeping statements referred to, their value is somewhat affected by the note of exaggeration which I detect in the testimony of Price, Smith, and the bankrupt. Price when asked by defendant company's counsel whether he solicited and obtained the mortgage with a view or intention of seeking an advantage or preference over other creditors of the bankrupt, answered without hesitation that he did not. Even if the bankrupt had been solvent, the defendant company thereby acquired a decided advantage over the large body of creditors who had no security whatever; i. e., he had a prior claim to a certain definite piece of property, and none of them had any such claim. Should insolvency subsequently ensue, this prior claim would be enforced. When he solicited and obtained the mortgage, then he must have known that he obtained an advantage, and taken it with that view and intention. Smith was asked as to what was his belief at the time the mortgage was executed as to the bankrupt's solvency, and his answer was that he thought he was "perfectly solvent"; and when asked as to the bankrupt's general reputation as to solvency, honesty, and integrity as a merchant, he answered, "As good as any man in town." I find it hard to accept the statement that his general reputation for solvency could have been as good as any man in the town of Somerset. Then the bankrupt, in answer to defendant company's counsel, testified that at the time he made the mortgage he believed he was able to meet his indebtedness, a thing which it was impossible for him to do. His creditors had not then

begun to press him, and he may have then thought that he would be able to continue in business for a considerable time. But the slender basis on which such a thought rested, if it existed, is evident from the fact that in a very few days after the making of the mortgage, and not as a result of its making, as it was not put to record at once, the pressure upon him from other creditors became so great that he returned to his brother the money which he had obtained from him and determined on an assignment for the benefit of his creditors.

The defendant company, at the time the mortgage was executed, had at least this much knowledge as to the bankrupt's financial condition. It knew that he was heavily in debt to it on an account long overdue and bearing interest, and that so far at least as it was concerned he was not able to meet his obligations as they became due. It knew what real estate he owned, and that with the execution of its mortgage it all became incumbered nearly at least to the amount of its value. And it also knew the extent of his indebtedness, and that it was a large indebtedness. All this knowledge, except that as to ability to meet his obligations, was obtained at the time the mortgage was executed from inquiry and investigation. It may be said to come short of knowledge of the fact that the bankrupt was insolvent and the mortgage covered a greater percentage of his property than it was entitled to. And it may be conceded, for the sake of the argument at least, that this knowledge was not such that the reasonable inference therefrom was that the bankrupt was insolvent and the mortgage covered such greater percentage; i. e., it was not such that the reasonable effect thereof was a belief that such was the case. It may be taken for granted further that its action in the matter was not such as to show that it did so believe, from which it might be inferred that it had more knowledge than the evidence discloses. It would seem to be certain, however, that it feared that the bankrupt was insolvent. The evidence which it had was calculated to create such fear, and it acted as if it did so fear. It did so in not inquiring or making any examination as to the bankrupt's assets after it had ascertained the extent of his liabilities. The failure so to do can reasonably be accounted for on the ground that it feared that he was insolvent, and it can be accounted for on no other ground. It must have known that if the bankrupt was insolvent, and it knew him to be so, its mortgage would be invalid. It did not then know that he was insolvent. Further inquiry, or an examination of his stock and books, might reveal that he was. By refraining therefrom it would be in position to claim that it did not know, or had no reasonable cause to believe, that the mortgage would effect a preference. Otherwise, in the natural course of things, it would have so inquired. It was considerably interested in his condition. The knowledge which it had was calculated to awaken suspicion, if not fear, of insolvency, and the means of ascertaining were right at its hands. Notwithstanding it stayed the inquiry. It is reasonable to conclude, therefore, that though it may not have believed, or had reasonable cause to believe, that the bankrupt was insolvent, it feared that he was, and it so feared it that it shut its eyes to the truth in regard to the matter.

The question upon this phase of the case then comes to this: If a bankrupt is actually insolvent, and one of his creditors does not know

that he is, or does not know that, the reasonable effect of knowing which is belief that he is, but fears that he is, and his fear is such that in soliciting security for his debt he refrains from inquiry as to the bankrupt's solvency so as to be in position to claim that he did not know his insolvency, or that the reasonable effect of knowing which would be belief that he was, in case the security obtained should be subsequently attacked, can it be said that the security so obtained comes within section 60b and is voidable? Its requirement is that the creditor shall have reasonable cause to believe; i. e., know that the reasonable effect of knowing which is such belief. If the reasonable effect of what he knows goes no further than such fear—i. e., does not reach such belief—and the creditor's mental state is such fear, and not such belief, on what basis can it be claimed that the security obtained comes within that provision and is voidable? It seems to me that the security obtained in such a case does so come, and is voidable, and that on this basis: A reasonably prudent man, having such fear and the opportunity to find out by inquiry, would, in the absence of a motive not to do so, inquire. It is, therefore, his duty to inquire. The fact that it is against his interest to inquire does not relieve him from such duty. He has no right, because of it, to refrain from inquiring. It being his duty to inquire, he is chargeable constructively with the knowledge which he would have obtained, had he done so. He should be dealt with the same as if he had inquired, and obtained knowledge that the debtor was insolvent. Constructive knowledge always has the same effect as actual knowledge. It is in this way that I would bring such a transaction within section 60b.

Counsel for defendant company contend that mere suspicion on the part of the preferred creditors is not enough, and cite in support of this contention three cases: Tumlin v. Bryan, 165 Fed. 166, 91 C. C. A. 200, 21 L. R. A. (N. S.) 960; First Nat. Bank v. Abbott, 165 Fed. 852, 91 C. C. A. 538; Sharpe v. Allender, 170 Fed. 589, 96 C. C. A. 104. These cases do hold that mere suspicion is not enough. They arose, however, prior to the amendment of 1910 to section 60b, when, in order to a voidable preference, in addition to the three things above stated, it was essential that there be an actual intent to prefer on the part of the bankrupt, and the reasonable cause to believe required was that a preference was intended. I am not prepared to say how far they are authorities as to the effect of mere suspicion under the amendment of 1910. Possibly the point decided in them holds good under the amendment. This, however, is not a case of mere suspicion, nor of a payment in the regular course of business, as in each of those cases. It is a case of fear such as to lead the preferred creditor to close his eyes to the truth, and a transfer by way of mortgage. In the case of Stern v. Paper (D. C.) 183 Fed. 228, Judge Amidon said:

"Thus between actual knowledge and actual belief on the one side and fear and suspicion on the other lies the reasonable cause to believe mentioned in the section. This classification, however, is not as helpful in the decision of a concrete case as it appears. Fear and suspicion of insolvency, if they be strong enough, become belief, and the difficulty with the classification is that there are no criteria by which it can be said that one set of facts ought to

engender fear and suspicion only, while another set of facts furnish reasonable cause for belief. It is impossible to group the ever-changing facts of business life into hard and fast categories, and say that one category produces fear and suspicion and another belief."

Here four mental states are referred to, as follows, to wit, stating them in an ascending scale: Suspicion; fear; belief; and knowledge. Fear differs from the others, in that in the case of it there is an interest and desire to have that to which it relates different from what it is feared to be. One may suspect, believe, or know that such a thing is so, without any interest or desire to have it otherwise; but he cannot fear that it is so without such interest or desire. These mental states are separate and distinct from each other. They do not shade off into one another. Possibly, where a creditor suspects his debtor is insolvent, he also fears that he is. At any rate, he readily passes from the one state to the other. Now, the only one of these four mental states which the statute calls for is knowledge. It does not use the word "know," but that which is its equivalent, to wit, "shall have reasonable cause to believe." Having reasonable cause to believe is knowing that the reasonable effect of knowing which is belief, or that which reasonably should cause belief. There are different degrees of knowledge which it is possible for the preferred creditor to have. He may know that the debtor is insolvent, and that the transfer to him covers a greater percentage of his property than he is entitled to, and hence that it effects a preference. Possibly this is a greater degree of knowledge than called for by the terms of the statute, but it is within its intent. For if a lesser degree of knowledge suffices, certainly the greater degree is not to be excluded. Then comes, not such knowledge, but knowledge of that the reasonable effect of knowing which is belief to that effect. This degree of knowledge is called for in so many words. Then comes knowledge of that the reasonable effect of knowing which is not such belief, but only a fear or suspicion that such is the case. Such a degree of knowledge is certainly not within the words of the statute.

The problem I have been considering is whether it is ever possible for a case where the preferred creditor has only such a degree of knowledge to come within the statute, and, if so, on what basis does it come within it? The conviction reached has been that it is possible. If the degree of knowledge is such as to engender fear that such is the case, so strong that the preferred creditor refrains from availing himself of the means at his hand for ascertaining the truth, in order to keep himself in the dark in regard thereto, and to be in position to claim that he did not have reasonable cause to believe that the transfer to him would work a preference, the case is covered by the statute. It is brought within the statute by holding that he had constructive knowledge of what he would have ascertained, had he inquired, and the effect of constructive knowledge is the same always as actual. This position finds support, I think, in this further quotation from Judge Amidon's opinion in Stern v. Paper, supra, to wit:

"Hence, under this statute, 'notice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonable, diligent inquiry would develop.' Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99. But if a party had knowledge of

facts which cause him to fear or suspect that a transaction into which he is entering will work a preference, that knowledge as a rule will at least be sufficient to put him upon an inquiry which, if prosecuted, would disclose the real character of the transaction. It follows, therefore, in my judgment, that the doctrine that fear or suspicion of a preference is not sufficient to invalidate a transfer must have restricted application under our present bankruptcy law."

And see 1 Loveland on Bankruptcy, p. 1010.

Possibly the matter may be viewed thus. One who, in such a case, makes no inquiry because of fear as to the result, when he would make it, if it were not for such fear, may be said to believe what he fears. Such fear, according to Judge Amidon, is "strong enough" to "become belief." It is questionable whether fear is ever so strong, and still mere fear. If it is so strong, it would seem that it ceases to be fear, and passes into belief. "Grief before grief" is the definition of fear given by some one, who, at the same time, defined hope as "joy before joy." Perhaps, therefore, it would be better to treat such a case as one of belief, and not of fear. A case of belief may be said to come within the statute on either one of two views. As heretofore intimated, from the existence of such belief knowledge of more than is proven and sufficient to constitute reasonable cause is inferable, or belief, where the fact is as believed to be, as well as knowledge, that the transfer will effect or operate as a preference is within the intent and spirit of the statute, though not within the letter.

I am therefore constrained to hold that the mortgage in question is a voidable preference, whether judged as of the date of its execution or of its recording. I sincerely hope that in so holding I have done no one an injustice. I am aware of the danger that comes from an "overstrained acumen," or an "ear which hears grass grow," and have endeavored to avoid it. But I feel quite confident that I have reached the reality that lies behind the circumstances of this case.

Let plaintiff prepare and submit a decree.