### HEALY v. WEHRUNG.

(Circuit Court of Appeals, Ninth Circuit. February 7, 1916.)

No. 2575.

1. BANKRUPTCY ⬥303—PREFERENCES—SUFFICIENCY OF EVIDENCE.

In an action to recover back money paid by a bankrupt to a creditor within 30 days before the adjudication, evidence *held* to show that the bankrupt was then wholly insolvent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. ⬥303.]

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. BANKRUPTCY ⬪166—PREFERENCES—KNOWLEDGE AND INTENT OF TRANSFEREE.

Within 30 days before an adjudication in bankruptcy against M. he paid defendant the amount of debts due him, defendant's wife, and the bank of which defendant was president, from the proceeds of a sale of land to a purchaser procured by defendant. Defendant and the bankrupt's attorney, who was an indorser on the note to the bank, attended to the sale; the bankrupt shortly afterwards not even remembering the purchaser's name. The selling price was within a few cents of the amount of such debts. Defendant had his own lawyer examine the title for the purchaser, paying the lawyer himself, and it was claimed that he did this to save time. Defendant had for years been trying, without success, to collect the debts. He claimed that shortly before he was furnished by the bankrupt a statement of his financial condition, and that from this and from his own mercantile experience he thought the bankrupt solvent. In the statement a stock of merchandise which afterwards sold for less than $12,000 was valued at over $40,000, accounts receivable, which were apparently worthless, aggregating nearly $10,000, were included, and debts aggregating $50,000 were shown. *Held*, that the facts showed that defendant not only had reasonable cause to believe that he would be given a preference, but that he initiated and caused the transaction to be consummated for the very purpose of procuring a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. ⬪166.]

Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Action by George M. Healy, as trustee in bankruptcy of H. J. Martin, against W. H. Wehrung. Judgment for defendant, and plaintiff appeals. Reversed and remanded, with directions.

Beach, Simon & Nelson, of Portland, Or., for appellant.

J. F. Shelton, of Portland, Or., and H. T. Bagley, of Hillsboro, Or., for appellee.

Before GILBERT and ROSS, Circuit Judges, and RUDKIN, District Judge.

ROSS, Circuit Judge. This suit was brought by the trustee of the estate of one H. J. Martin, a bankrupt, to recover certain money alleged to have been received by the appellee (who was defendant in the court below) from his debtor, Martin, while insolvent, on the 4th day of March, 1913, contrary to the provisions of section 60b of the Bankruptcy Act, which provides:

"If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person." Act July 1, 1898, c. 541, 30 Stat. 562 (Comp. St. 1913, § 9644).

Martin filed his voluntary petition in bankruptcy on the 25th day of March, 1913, and was on the same day adjudged a bankrupt. The present suit was brought by direction of the bankruptcy court, and resulted after trial in a judgment dismissing the suit, with costs to the defendant, from which judgment this appeal comes; the sole con-

tention of the appellant being that upon the evidence judgment should have been awarded the plaintiff.

The respective parties are agreed that four elements are necessary to constitute a voidable preference: First, the debtor must have been insolvent at the time of the making of the transfer of his property; second, the transaction must have taken place within four months prior to the commencement of the bankruptcy proceeding; third, the effect of the transfer must have been to give the preferred creditor a greater percentage on his claim than that accruing to other creditors; fourth, there must have existed at the time of the transfer reasonable cause for the creditor to believe that it would result in a preference to him.

[1] That Martin transferred $1,473.20 of his money to Wehrung on the 4th of March, 1913, which was less than 30 days preceding his adjudication in bankruptcy, is conceded, and while it is contended on the part of the appellee that Martin was not insolvent at the time of such transfer, we are unable, after a careful examination of the evidence, to come to any other conclusion than that he was wholly insolvent at that time. The record shows that for years he and his former partner, to whose interest he seems to have succeeded, had been carrying a very heavy indebtedness considering the amount of his assets, which consisted of an old stock of drugs and an old stock of postal cards, together with a homestead in Portland, and 67½ acres of land in Washington county, Or., and a small amount of apparently worthless outstanding accounts. The defendant himself admits that the amount owed him by Martin, as well as the money due his mother and the Hillsboro Bank, of which he was president, and hereinafter referred to, had been owing for years and had been renewed from time to time—on one occasion being extended for a period of one year to enable the debtor to pay off, if he could, some of his other creditors.

The testimony of the trustee, Healy, which is without contradiction, and who during the times in question was credit and office manager of Clarke-Woodworth Drug Company of Portland, is to the effect that Martin owed that firm about $7,000, which was for purchases made from a year to a year and a half before, which the Clarke-Woodworth Company had repeatedly tried to collect without success and had for that reason stopped making sales to him on credit, but requiring cash for his purchases, and that during the month of February or March, 1913, Martin made to his creditors two offers of settlement, the first at 25 cents on the dollar; and the other at 20 per cent. Healy further testified that a short time prior to the filing by Martin of his petition in bankruptcy, which, as has been said, was March 25, 1913, there was a meeting of his creditors, about 50 in number, in the office of Martin's attorney, Mr. Sweek, which meeting, in the nature of things, could only have been in consequence of his serious financial condition, the critical nature of which, even prior to the 1st of March, 1913, is further shown by Martin's own testimony, in which he stated in effect that at the time of his transfer to the defendant Wehrung, hereinafter to be referred to, several suits had already been brought against him, that practically all of his indebtedness was past due, that he had no cash on hand, not even sufficient to pay his clerks

as their wages became due. And when it is considered, as the evidence shows, that the trustee only received upon the sale of the stock of drugs and postal cards the aggregate sum of $11,779, which was sufficient to pay the creditors of the bankrupt 10 cents only on the dollar, we have no difficulty in holding that he was manifestly insolvent on the 4th day of March, 1913, the time he is charged with having given to Wehrung an unlawful preference.

[2] There remains, therefore, only for consideration the question as to whether Wehrung, when he received the money in question from Martin, had reasonable cause to believe that such receipt would result in a preference to him over other creditors—he thereby receiving payment in full of the indebtedness due him, as well as full payment of the indebtedness of the bankrupt to his mother and to the bank of which he was president. Wehrung testified that on February 1, 1913, Martin presented him a statement of his business, showing accounts receivable $9,971.32, merchandise $40,281.80, fixtures $7,101.10; accounts payable $17,516.96, bills payable to banks and others $33,667.43 —leaving, according to the statement, a surplus of $6,169.83. Wehrung further testified that from his mercantile experience he regarded the fixtures, the value of which, as has been seen, was given in the statement at $7,101.10, worth their cost, and that the accounts receivable given in the statement as $9,971.32 were, in his judgment, worth 90 cents on the dollar. Deducting, therefore, from the stated surplus of $6,169.83, 10 per cent. from the accounts receivable, leaves a surplus of $5,172.70. Wehrung testified that upon that statement he would have loaned Martin additional money, if he had asked for it.

That testimony we can but regard, not only as highly improbable, in view of the statement rendered by the debtor, but as utterly inconsistent with Wehrung's further testimony to the effect that for years he had been trying, without success, to collect from Martin the indebtedness due him, his mother, and the bank of which he was president, as well as highly inconsistent with his *acts* now to be shown. In his testimony Wehrung admits that about a month after he received Martin's financial statement he sought to sell the latter's 67½ acres of land in Washington county to a man named Douty, telling the latter, according to Douty's testimony (which was practically admitted to be true in the testimony of Wehrung himself), that Martin was in bad shape, needed money, and that a then pending damage suit would surely go against him. He told Douty, according to the evidence, that the land could be bought for $150 an acre, which it was well worth, and Douty, after examination, said that he would take it at that price. Wehrung, according to the evidence, told Douty that he would have his (Wehrung's) lawyer examine the title for him, which he did, paying him himself therefor, a deed from Martin to Douty for the land was prepared, the consideration for which, arranged by Wehrung with Douty, was within about 35 cents of the exact amount of the agregate indebtedness of Martin to Wehrung, his mother, and the bank of which he was president, to wit, $5,875, and then Martin was notified to meet Wehrung and Douty in the office of Martin's attorney, Sweek, who was an indorser on Martin's note

229 F.—44

to the bank of which Wehrung was president. We extract from the testimony of Martin:

"Q. What dealings did you have with the purchaser? A. Why, I don't know as I had any more than to make out the deed. Q. Did you make out the deed? A. I think Mr. Sweek made it out for me. Q. And Mr. Sweek or Mr. Wehrung attended to the sale entirely, did they not? A. Yes, sir. Q. At the hearing before the referee in bankruptcy, you didn't even know the name of the purchaser of the property? A. No, sir, no; that is, to my best recollection, I didn't."

Martin also, according to the record, was questioned and answered as follows:

"Q. Who handled that transaction for you? A. Mr Sweek. Q. Was anything said at the time about the legality of the transaction, whether you had a right to do that? A. Mr. Sweek said I had a right to ask—to sell the land to pay off what I wanted."

The case as made by the record is, we think, but little, if at all, overdrawn in this excerpt from the brief of the appellant:

"A debtor is grossly insolvent, offering a settlement of 20 cents on the dollar to his creditors. The debtor's lawyer is responsible on some of his paper held by a creditor representing $5,875. On the advice of that lawyer, the debtor, on the eve of bankruptcy, transfers his principal asset, his unexempt real estate, to a hurry-up purchaser, produced by that creditor; the creditor furnishing and paying his own lawyer for services in connection with the title in order to save the time of examining the abstract. The transaction is consummated in the suite occupied by the debtor's lawyer. The selling price by a remarkable coincidence exactly equals the indebtedness to the creditor—$5,875. The debtor a few weeks later does not even know who purchased the property. The creditor thus secures 100 cents on the dollar, and all the other creditors 10 cents—except the mother of this particular creditor and the bank of which he was president, both of which creditors also received payment in full through the same act of preference."

In so far as creditors are concerned, the purpose and policy of the Bankruptcy Act is the equal and equitable distribution of the bankrupt's estate among them, subject only to the preferences or priorities therein expressly allowed. From all the facts and circumstances shown by the record here, we regard it as clear that not only did the appellee, Wehrung, have reasonable cause to believe that by the payment to him he was thereby given a preference, but that the sale of the bankrupt's land which he initiated and caused to be consummated was all done for the very purpose of securing to himself, his mother, and the bank of which he was president such preference. See Toof v. Martin, 13 Wall. 40, 20 L. Ed. 481; Wager v. Hall, 16 Wall. 584, 21 L. Ed. 504; Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99; In re McDonald & Sons (D. C.) 178 Fed. 487; Ogden v. Reddish (D. C.) 200 Fed. 977; Heyman v. Bank (D. C.) 216 Fed. 685.

The judgment is reversed, and the cause remanded to the court below, with directions to enter judgment for the plaintiff.