In re THOMAS DEUTSCHLE & CO. (2)

(District Court, M. D. Pennsylvania. October 28, 1910.)

No. 1,445.

1. BANKRUPTCY (§ 166*)—PREFERENCES—NOTICE OF INSOLVENCY.

Bankrupts being indebted to claimants on notes for lumber which had frequently gone to protest, claimants had accepted another order for lumber and were about to fill it, when they learned that the bankrupts were in difficulty and did not do so. They were also advised, on inquiring at a bank where the bankrupts were in business, that their condition had improved, and it was thought that they would pull through. *Held*, that such information was sufficient to put the claimants on inquiry as to the bankrupts' financial condition, and that payments thereafter made and received within four months prior to bankruptcy constituted voidable preferences.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

2. BANKRUPTCY (§ 166*)—PREFERENCES—NOTICE OF INSOLVENCY.

That the notes of the bankrupts during the year prior to bankruptcy had frequently gone to protest was insufficient to put the holder on inquiry, to charge him with notice of the bankrupts' insolvency sufficient to avoid payments made within four months prior to bankruptcy as preferences, especially where the creditor, on going to the bankrupts, was informed that their plant was under better management and that in the future they would be able to pay their bills more promptly.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

3. BANKRUPTCY (§ 166*)—PREFERENCES—NOTICE OF INSOLVENCY.

A creditor of bankrupts, having had trouble in getting notes paid, went to the place where the bankrupts conducted their business, and, meeting T., who was formerly in the bankrupts' employ, stated to him that he was going to collect the claim "one way or another," to which it was replied that he should not be reckless, and that he could not afford to make trouble. The same day T. let the bankrupts have a check for some $200, which was paid to the creditor. *Held*, that such facts were insufficient to charge the creditor with notice of the bankrupts' insolvent condition, so as to require him to surrender the payments made within four months of bankruptcy as preferences.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

4. BANKRUPTCY (§ 166*)—PREFERENCES—NOTICE OF INSOLVENCY.

Where bankrupts' creditor had placed his claim in the hands of a collection agency, and had threatened suit unless it was paid, involving a possibility of insolvency, the creditor would be presumed to have had knowledge of the debtors' insolvent condition, so as to make payments made within four months of bankruptcy preferences.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

5. BANKRUPTCY (§ 166*)—PREFERENCES—NOTICE OF INSOLVENCY.

Bankrupts having ordered a car load of lumber from claimant and being unable to pay the freight thereon, claimant advanced the freight in order to save demurrage. *Held* that, though such arrangement was out of the ordinary, it did not charge claimant with notice of the bankrupts' insolvent condition, so as to make payments made to the bankrupts within four months preferences.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

6. BANKRUPTCY (§ 166*)—PREFERENCES—NOTICE OF INSOLVENCY.

Bankrupts having ordered a car load of lumber from claimants, they, were advised that the bankrupts could not pay the freight on it, and stopped delivery of the car, and refused to let it be delivered without getting a certified check for it. It was also reported to them that the bankrupts were in bad shape financially. *Held*, that they thereby had reasonable cause to believe that the bankrupts were insolvent, and that payments subsequently made within four months before bankruptcy constituted preferences.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

In the matter of proceedings against Thomas Deutschle & Co., bankrupts. On exceptions to the action of the referee, expunging and refusing to expunge certain claims. Affirmed in part, and reversed in part.

A. R. Jackson and M. C. Rhone, for trustee.

Harry S. Knight, for claimants.

ARCHBALD, District Judge. The trustee moved to expunge certain claims, on the ground that voidable preferences had been secured by the claimants, which they were required to surrender. The referee threw out two claims for this reason, but sustained the others, and both sides have excepted. In each instance the claimants received substantial payments within four months of bankruptcy, and the question is whether they had reasonable cause to believe that a preference was intended. The bankrupts were hopelessly insolvent, and the payments gave the claimants an advantage over other creditors of the same class, and so preferred them; and that being the natural, if not the inevitable, consequence, it is presumed to have been intended. The case turns, therefore, on whether there was enough to put the claimants on inquiry.

In the case of T. R. Harter & Co., the debt had been standing for over a year; the last shipment of lumber being in June, 1908, and bankruptcy having occurred in June following. On March 25, 1909, there was a payment of $15; on March 31, $100; and on April 26, $50; reducing the claim to $810.75. At the time of these payments the claim was in notes, which had been carried along for a considerable period, small payments being made on them as they fell due, and renewals being taken for the balance. These notes went frequently to protest, and were the subject of constant complaint, and it was only by great urgency that anything was secured on them. Notwithstanding this, however, the claimants had accepted an order for more lumber, and were about to fill it, when they learned that the bankrupts were in difficulty, and did not do so. They were also advised, on inquiry of the bank at Montgomery, Pa., where the bankrupts were in business, that their condition had improved, and it was thought that they would pull through, a dubious statement, which carried with it the intimation that they possibly might not. This, together with their own experience, by which, for nearly a year, they had been unable to get payment of their debt, except by notes, which were chronically under protest, suggested critical embarrassment, and

was enough to put them on inquiry and affect them with notice of what would have been disclosed by it.

It is true that the mill was a going concern, and made a showing in itself of some $10,000 of unincumbered real estate. It is also a fact that Deutschle thought he could pull through if he could raise $2,000. And it is no doubt the case that, during the two years following the panic of 1907, there were many solvent concerns which trembled on the edge of bankruptcy. The payments in controversy also were on an existing account, in the usual course of business, and it was not the same as if the bankrupts were asking credit on orders sent in, and the claimants were looking into their condition before filling them. Nor did the claimants appear to see anything hazardous in letting them have another car of lumber, which they would have done, except as they were happily advised against it by others. But the fact remains that there was a direct warning in the response of the Montgomery bank that the situation was a doubtful one, which they could not disregard, even if their own experience was not sufficient to do so. It was not simply that the bankrupts were slow pay, if that imputation in any way relieves them, but that their condition was critical, involving possible insolvency, which would have been disclosed by the most casual inquiry, and which the claimants could not put aside, and escape the consequences. In the payments received the claimants, therefore, took the risk of that, and having reasonable cause to believe, in consequence, that a preference was intended, their claim must be expunged, unless they are willing to surrender it.

J. K. Reisch had a claim for lumber sold, amounting to $2,059.08, on which payments of $826 were made, those within four months of bankruptcy being as follows: February 3, $50; March 1, $50; March 18, $50; and April 26, $50. The claim had been standing for about a year, and had been put into four notes, and the payments in question were made at the time of taking renewals. The only thing to affect the claimants with notice was the fact that during the year these notes and those of the firm of Reisch & Orwig, of which Mr. Reisch was a member, had gone to protest with considerable frequency. But this is not enough. It shows a lack of ready money, no doubt, and possible embarrassment, but not necessarily insolvency, and was not, therefore, of itself sufficient to put the claimant on inquiry. Besides that, on going to Montgomery, to see about one of the notes which had been protested, Mr. Reisch was told by Mr. Deutschle that the plant was under better management, and that in the future he would be able to pay his bills more promptly; it being explained as to the past that his work had been costing him too much. This certainly was assuring, and coupled with the fact that the mill was a going concern, and that there was nothing openly pressing it, he was not required to go further. He could not know that the freight bills were unpaid, and that cars were allowed to stand on the railroad siding unloaded because of it, incurring large demurrage charges. The referee was right, therefore, in allowing this claim to stand.

Nor does the claim of Reisch & Orwig stand differently. This claim had been running for a year, and was originally about $625,

which had been reduced by payments to $75; the last one, on March 30, being $25. It may be that Reisch & Orwig were affected with knowledge possessed by Orwig & Sons; the two firms having a common member. But the only additional thing that this brings in is that Orwig & Sons, in October, 1908, threatened suit if they were not paid, and thereby got their money.

C. L. Meckley had a claim of some $800, the last material shipped being November 26, 1908. On March 12, 1909, he was paid $50; on March 22, $66.54; and on April 30, $200, with $2.07 protest fees. When the last payment was made, Mr. Meckley had gone to Montgomery, and, meeting J. D. Townsend, who used to be in Deutschle's employ, said that he was going to collect his claim one way or another, to which Townsend replied that he should not be reckless, and that he could not afford to go and make trouble. The same day, at the office, Townsend let Deutschle have a check for some $200, which was paid to Meckley. There is nothing in this beyond the anxiety of Meckley for his money, and the warning of Townsend, if that is the way it is to be considered, not to stir up trouble. But this, such as it was, is offset by the fact that Townsend was willing to let Deutschle have the money to pay with, which was certainly calculated to dispel the effect of the previous caution, whatever it amounted to. It would be straining things to hold that the claimant could not accept payment under the circumstances without being compelled to give it up in the event of bankruptcy.

The Eastern Lumber Company had a claim of $1,369.77, partly in notes and partly in book account. On April 19 they were paid $300, and on May 5, $100; the latter being four days after the meeting of creditors called by the bankrupts, at Mr. Knight's office, of which they had notice. These payments were secured through the National Lumber Dealers' Association, in whose hands the claim had been placed for collection. The claimants were clearly affected by the meeting of May 1, and the payment of $100 after that was unquestionably a preference. The same conclusion also must be reached as to the $300. When things have advanced to such a pass that creditors find it necessary to put their claims in the hands of attorneys or collection agencies, and to threaten suit unless they are paid, this being the last resort, and contemplating a compulsory payment by judgment and execution, there is a confession of financial extremity, involving the possibility of insolvency, of which they take the risk, and must abide the consequences. This claim must therefore be expunged, unless the payments are surrendered.

The McKee Lumber Company had a claim which was reduced to $250 by a payment on March 1 of $98.06, and on April 26 of $50. The only thing to affect the claimants with notice is that in September, 1908, when the lumber was ordered, on the arrival of the car, the bankrupts could not pay the freight bill, $277.46, which the claimants had to advance for them, in order to save demurrage. No doubt this was out of the ordinary; but, whatever its significance at the time, it had none six months afterwards, and that is all that is necessary to say about it.

The referee expunged the claims of Shearer & Sons and the R. G. Page Lumber Company, and exception is taken by these parties, severally, to this action. So far as concerns the claim of Shearer & Sons, however, the facts are so conclusive that there is no occasion to linger over them. The payments of which complaint is made were in April, 1909, and amount to some $240. And it is testified by Mr. Shearer that, before they were made, it was reported that the bankrupts were in bad shape financially. Before any of the payments, also, except possibly the first one, the claimants had stopped the delivery of a car of lumber, which had been forwarded, being advised that the bankrupts could not pay the freight on it, and they refused to let the lumber be delivered without getting a certified check for it. It is idle to urge, in the face of these circumstances, that they did not have reasonable cause to believe a preference was intended.

As to the claim of the R. G. Page Lumber Company, the only things against it are that on one occasion, in October, 1908, five or six months before the payments in controversy, the bankrupts were not able to pay the freight on a car of lumber; and that there was a small demurrage charge, for the same reason, on another car in January. This, and the fact that the notes of the bankrupts went to protest from time to time, do not seem to be enough to put the claimants on inquiry, and the claim will therefore be restored and allowed to stand.

The refusal of the referee to expunge the claims of J. K. Reisch, Reisch & Orwig, C. L. Meckley, and the McKee Lumber Company is sustained; but his refusal to expunge the claims of T. R. Harter & Co. and the Eastern Lumber Company is reversed, and he is directed to expunge these claims, unless within 10 days the preferences complained of are surrendered.

The action of the referee in expunging the claim of Shearer & Sons is also sustained; but his action in expunging the claim of the R. G. Page Lumber Company is reversed, and the claim is directed to be reinstated and allowed.