## HEYMAN v. THIRD NAT. BANK OF JERSEY CITY.

(District Court, D. New Jersey. August 18, 1914.)

1. BANKRUPTCY (§ 164*)—VOIDABLE PREFERENCE—SET-OFF.

A bankrupt, who was indorser on notes held by a bank, also had a deposit in such bank, and about a week before the bankruptcy, and before any of the notes were due, gave the bank a check, which it at once had certified and charged to his account, later, and after the bankruptcy, applying the sum in payment of one of the notes, then matured, and in part payment of another, unmatured. *Held*, that the transaction was not an exercise by the bank of the right of set-off given by Bankr. Act July 1, 1898, c. 541, § 68a, 30 Stat. 565 (U. S. Comp. St. 1901, p. 3450), since it took place prior to the bankruptcy and when the notes, not then matured, were not subject to such right; that, in view of the unusual circumstances of payment before due and the certification and charging of the check at once by the bank on which it was drawn, such bank must be deemed to have had reasonable cause to believe that the bankrupt was insolvent, and that the payment would effect a preference which rendered it voidable, under section 60b (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3446]), as amended by Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (U. S. Comp. St. Supp. 1911, p. 1506).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 267; Dec. Dig. § 164.*]

2. BANKRUPTCY (§ 165*)—PREFERENCES—WHEN VOIDABLE.

Under Bankr. Act 1898 (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3446]) § 60b, as amended by Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (U. S. Comp. St. Supp. 1911, p. 1506), the intent of an insolvent debtor to give a preference is not essential to render it voidable, but the effect of the transfer and reasonable cause to believe that a preference would be effected on the part of the creditor are substituted therefor, which necessarily includes, as an element, reasonable cause to believe the debtor to be insolvent, and, while mere suspicion is not sufficient if the facts and circumstances known to the creditor are sufficient to put a reasonable man on inquiry, he is chargeable with knowledge of the facts which such inquiry would disclose.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*]

In Equity. Suit by Samuel Heyman, trustee in bankruptcy of Orlando Ricciardelli, against the Third National Bank of Jersey City, to recover alleged preferences. The master advised a decree dismissing the bill, to which both parties except. Exceptions of complainant sustained.

Frank W. Hastings, Jr., of Jersey City, N. J., for trustee.

Fisk & Fisk, of Jersey City, N. J., for Third Nat. Bank of Jersey City.

RELLSTAB, District Judge. For a number of years prior to the 8th of December, 1911, Orlando Ricciardelli (the bankrupt) kept an active banking account with the defendant. On that date he was contingently liable to the defendant as indorser on three unmatured promissory notes made by his wife, and discounted by the bank, the avails of which had been credited to his account. The first of these notes, for $900, fell due on December 20, 1911, the second, for $1,600, on January 13, 1912, and the third, for $2,000, on February 15, 1912. On December 8, 1911, Ricciardelli gave the bank a check for $1,000 on account of such obligations. This check, payable to the order of his wife and by her indorsed, was drawn on his account in such bank. It was certified by the bank and charged against such account the same day, but was held by it until December 15th, when said bank applied $900 thereof in payment of the $900 note and the remaining $100 on account of the $1,600 note. In the meantime, viz., December 14th, a petition in involuntary proceedings in bankruptcy was filed against Ricciardelli, upon which an adjudication was subsequently entered.

The trustee's action is to recover this $1,000 thus appropriated by the bank, on the ground that it is a voidable preference, within section 60b of the Bankruptcy Act. To constitute such a preference, and the master so held, the following four elements are necessary:

"First, the transfer must be made from an insolvent person to a creditor; second, the effect of such transfer must be to enable one creditor to obtain a greater percentage of his or its debt than others in the same class; third, the creditor receiving it must have had reasonable cause to believe that the effect would be a preference; and fourth, the transfer must have been made within four months prior to the bankruptcy."

[1] Both parties concede that this is a correct statement of the requisites to an avoidable preference. The master found that all of these requisites existed, save the third, and advised a decree in favor of the bank. Both parties excepted to parts of the finding of the master. The exceptions of the bank challenge the conclusion that the payment of the $1,000 was a transfer, within section 60 of the act, and raise the contention that such moneys were appropriated by the bank in the exercise of its right of set-off under section 68 of the act. The exceptions of the trustee attack the master's denial of the trustee's right to recover, and insist that the bank did have reasonable cause to believe that the payment of said $1,000 would effect a preference. The pertinent parts of these two sections are as follows:

"Sec. 60 (a). A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, * * * made a transfer of any of his property, and the effect of the enforcement of such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. * * *

"(b) If a bankrupt shall * * * have made a transfer of any of his property, and if, at the time of the transfer, * * * and being within four months before the filing of the petition in bankruptcy * * * the bankrupt be insolvent and the * * * transfer then operate as a preference, and the person receiving it * * * shall then have reasonable cause to believe that the enforcement of such * * * transfer would effect a preference,

it shall be voidable by the trustee and he may recover the property or its value from such person. ＊ ＊ ＊"

"Sec. 68 (a). In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

Money deposited with a bank in the ordinary course of business creates the relation of debtor and creditor. N. Y. County National Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380, 11 Am. Bankr. Rep. 42. Generally stated, money thus deposited may be appropriated by the bank to pay any matured debt due it from the depositor. The Bankruptcy Act did not create the right of set-off, but provided a method by which it could be enforced even after bankruptcy. Studley v. Boylston Bank, 229 U. S. 523, 33 Sup. Ct. 806, 57 L. Ed. 1313, 30 Am. Bankr. Rep. 161.

Section 1 (11) construes "debt" to "include any debt, demand, or claim provable in bankruptcy."

Section 63a defines a provable debt as one inter alia "(4) founded upon ＊ ＊ ＊ a contract express or implied." The liability of an indorser on commercial paper, not absolute until after the filing of the petition in bankruptcy, is a debt provable in bankruptcy. Moch v. Market St. National Bank, 107 Fed. 897, 47 C. C. A. 49, 6 Am. Bankr. Rep. 11. Such a debt may be used to enforce the right of set-off within section 68. In re Semmer Glass Co., 135 Fed. 77, 67 C. C. A. 551, 14 Am. Bankr. Rep. 25. But obviously the regulation of the right of set-off in the Bankruptcy Act does not relate to the acts of the parties before the commencement of bankruptcy proceedings. It carries forward the equitable principle underlying the doctrine of set-off, and applies it to unmatured debts in order to facilitate the administration of the bankrupt's estate and the doing of justice to all the creditors. Before the commencement of such proceedings, therefore, the liability arising from the indorsement of unmatured commercial paper is not a debt usable to set off a fixed indebtedness. Irish v. Citizens' Trust Co. (D. C.) 163 Fed. 880, 21 Am. Bankr. Rep. 39. Undoubtedly, at any time before the commencement of bankruptcy proceedings, mutual dealers may adjust their accounts and consider unmatured obligations in such adjustment. But such adjustment is not the result of exercising the right of set-off; it rests in contract. The right of set-off, however, where not controlled by statute, is based on commercial equities having the force of law, and may be exercised by one regardless of the wishes of the other. In the case at bar, the bank had no right to set off the unmatured notes until after the bankruptcy proceedings were begun. If it had waited until the filing of the petition before attempting to enforce the indorser's liability on such notes, it could at such time have enforced the right of set-off given by the Bankruptcy Act against any deposit that may then have stood in the bankrupt's name. It did not do this, however, but about a week previous to such filing accepted the bankrupt's check drawn against such deposit on account of such notes. The physical holding of such check

by the bank until the first of such notes became due is of no moment upon the question whether a right of set-off was being exercised, as the bank, on the same day it secured the check, had it certified and charged to the drawer's account. The immediate effect of charging such check to the drawer's account was to transfer $1,000 from the depositor to the bank, and thus diminish by that amount (if it can be sustained) the estate to come into the trustee's hands, a diminution not the result of the exercise of the right of set-off, for, as noted, at that time no right to set off an unmatured obligation existed, but through a payment on account of contingent liabilities, and which did not mature until after the bankruptcy proceedings were begun. The conclusion reached on this branch of the case is in accord with In re National Lumber Co., 212 Fed. 928, 129 C. C. A. 448, 32 Am. Bankr. Rep. 389, decided by the Circuit Court of Appeals of this circuit, and reported since the preparation of this opinion. The master rightly treated the transfer of property as a payment on account. Is it voidable under section 60?

No contention is made that the master erred in his findings that Ricciardelli was insolvent at the time he gave such check, nor that the effect of sustaining it will give the bank a percentage of its debts, greater than other creditors of the same class. The controversy is thus narrowed to the question whether the cashier of the bank, at the time he received such check, had reasonable cause to believe that its enforcement would effect a preference.

[2] Intent to prefer, since the amendment of 1910, is no longer material. The effect of the transaction is substituted for the intent of the debtor. Actual knowledge, or even actual belief, that a preference will result is not required. Neither knowledge nor belief, but reasonable grounds to believe, is made the criterion of proof in such cases. Walbrun v. Babbitt, 83 U. S. (16 Wall.) 577, 582, 21 L. Ed. 489; Merchants' National Bank v. Cook, 95 U. S. 342, 346, 24 L. Ed. 412; In re C. J. McDonald & Son (D. C.) 178 Fed. 487–492, 24 Am. Bankr. Rep. 446, affirmed 184 Fed. 986, 106 C. C. A. 585, 25 Am. Bankr. Rep. 948; Pratt v. Columbia Bank (D. C.) 157 Fed. 137, 139, 18 Am. Bankr. Rep. 406–413; In re Neill-Pinckney-Maxwell Co. (D. C.) 170 Fed. 481, 22 Am. Bankr. Rep. 401; Dulany v. Waggaman, 22 Am. Bankr. Rep. 36, 46; Herron Co. v. Moore, 208 Fed. 134, 125 C. C. A. 356, 31 Am. Bankr. Rep. 221; Collier on Bankruptcy (10th Ed.) p. 819 et seq.

However, as a voidable preference within this section of the Bankruptcy Act cannot exist without the debtor's insolvency at the time of the transfer (a solvent debtor having the right to prefer a creditor), it follows that the facts constituting "reasonable cause," from which the potent belief is to be imputed to the creditor, include the element of insolvency. In re Chicago Car Equipment Co., 211 Fed. 638, 128 C. C. A. 142, 31 Am. Bankr. Rep. 617; Rogers v. American Halibut Co., 31 Am. Bankr. Rep. 576. What is such reasonable cause depends upon the particular facts of each case. While mere suspicion that a preference may result is insufficient (Grant v. Nat. Bank, 97 U. S. 80, 24 L. Ed. 971; Collier, supra, pp. 822, 823, and cases cited),

yet, as was said in Re Eggert, 102 Fed. 735, 43 C. C. A. 1, 4 Am. Bankr. Rep. 449:

"If facts and circumstances with respect to the debtor's financial condition are brought home to him, such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose."

The test here laid down has met the approval of later cases (In re C. J. McDonald & Son, supra; Herron Co. v. Moore, supra; In re Thomas Deutschle & Co. [D. C.] 182 Fed. 435, 25 Am. Bankr. Rep. 348; Newman v. Dry Goods Co., 174 Mo. App. 528, 160 S. W. 825, 31 Am. Bankr. Rep. 399), and in my judgment must be applied in the case at bar.

The master's treatment of the question whether reasonable cause to believe existed presents the peculiar situation of one who, after having correctly stated that the inquiry relates to the effect of the transfer, proceeds to discuss the evidence as if the inquiry related to the intent of the debtor. The cases cited and discussed by him as laying down the rules that must determine the question were all dealing with the law as it was before the amendment of 1910, which, as noted, substituted the effect of the payment for the intent in making it. While these cases are still authority for the tests to be applied in determining whether a reasonable ground for belief has been established, they are of little help upon the narrower or reduced scope of the inquiry which the amendment of 1910 purposely effected. Manifestly, with the mental attitude of the debtor eliminated, as a dominating factor, from the inquiry, neither his belief in, nor assertion of, his solvency, as evidencing his intent in the transaction, is of any value in considering the question whether the creditor had reasonable ground to believe that the result of such transfer would give him a preference; that is, whether it would so diminish the debtor's estate that, as between the payee of the challenged payment and the other creditors of the same class, the former would obtain a greater proportion of his claim. That the master was misled in his conclusions by not keeping in mind this change in the statutory law is evidenced by his language following his deduction of the rules laid down by the cases cited by him, viz., "We come now to considering whether, in the light of these rules, the complainant has shown, by the weight of the proof, that the bank had reasonable cause to believe that Ricciardelli intended to give a preference;" and that following his reference to some of the evidence, viz., "This is all the material testimony touching this branch of the case. This evidence does not, in my opinion, show that the bank had reason to believe that a preference was intended."

The master having thus evidenced his misapprehension of the determining factor of the issues before him, and I having reached a conclusion adverse to his recommendation, it is deemed advisable to make an extended reference to such of the evidence as bears on the question of reasonable cause to believe that a preference would be effected. As such cause for belief must have existed at the time of

the payment, only the occurrences at the time of giving the check, or within a reasonable time prior thereto, are material.

The bankrupt had dealt with the bank six or seven years. Drafts drawn on him in favor of certain of his creditors from time to time came into the bank's possession for collection. Within a week or so before December 8th, two drafts drawn on the bankrupt in favor of E. P. Scholl & Co. for shipments of macaroni, and with whom Ricciardelli had been doing business for several years, came to the bank for collection and on presentment were dishonored. This occasioned a conversation between Mr. Scholl of such company and Mr. Castens, the cashier of the bank, and several talks with Ricciardelli. According to the testimony of Scholl, the talk between him and such cashier was on December 7, 1911. He advised the cashier (in substance) that Ricciardelli refused to talk with him about the protesting of such drafts; that he wanted an extension of time without giving security; that the Naples Bank (which had forwarded such drafts for collection) would take immediate action if the drafts were not paid; that Ricciardelli, instead of taking such macaroni to his place of business, had taken the unusual proceeding of selling the merchandise (for the payment of which the drafts had been drawn) at the dock where it had been unloaded; that Ricciardelli was acting foolishly; that there was no necessity for him to fail; and that he wanted him (the cashier) to talk with Ricciardelli, as he was the only man who could handle him in the circumstances.

Mr. Castens (the cashier) recalls the talk over the telephone with Mr. Scholl about the unpaid drafts, but thinks that it was earlier than December 7, 1911. He says in substance that some time in the week prior thereto some one (he did not recall whether it was Mr. Scholl or not) had told him that Ricciardelli was selling the macaroni at the dock; that he had been told that Ricciardelli's teamsters were removing large quantities of goods from his stores; that when the drafts came he called up Ricciardelli and asked him about them; that sometimes they called him up two or three times a day; that Ricciardelli said he would not pay them for the reason that the macaroni was of an inferior quality, but that he would pay if a reduction was made, and that Scholl had refused to make a reduction. Castens further says that he does not recall whether Scholl said anything about bringing legal proceedings against Ricciardelli; that before December 8, 1911, within a day or two after his talk with Scholl, he had a talk with Ricciardelli about such conversation; that he did not advise Ricciardelli to pay the drafts as Scholl wanted him to; that on December 8th he telephoned or sent word to Ricciardelli to come and see him; that he "understood Mr. Scholl was going to make some trouble for him, and I (he) wanted to know where he stood, and he told me that he was solvent but he owed us some money"; that he does not recall whether he told him anything that Scholl had told him previously; that at that time Ricciardelli repeated the reason for not paying the drafts; that he said nothing to him (Ricciardelli) about payment upon the note or anything that caused him to give such check; that he was not particularly alarmed

about what Scholl told him; that the last financial statement he saw was probably six months before, made up by Mr. Scholl; that he made no inquiry at that time "as to a detailed nature of his financial condition"; that he had sent for Ricciardelli on account of these drafts; that on December 8th (date the check was given) he did not ask Ricciardelli or his wife to make payment on account of the notes; that about that time Ricciardelli also delivered to him warehouse receipts for goods stored in his name; that the giving of the check to the bank was entirely unexpected; that he was very much surprised at the turning over of the warehouse receipts; that Ricciardelli had never in his previous dealings made payments or pledges of goods on account of notes before they were due; that he could not tell why the check was certified, and that it was not customary for the bank to certify a check against the maker's deposit, given on account of notes held by the bank; that on certifying the check it was charged to Ricciardelli's account the same day (December 8, 1911); that he made no inquiry regarding Ricciardelli's financial condition after his talk with Scholl and before the payment of the $1,000 check; that the warehouse receipts were not given with the check, but afterwards, and were not pledged to pay the notes, but to borrow money; that no loan was made by the bank on such receipts; that these were retained until the receiver took possession.

Orlando Ricciardelli (bankrupt) testified in substance that he had done a big business with the bank for several years; that he told Castens to stop payment on Scholl's drafts because the macaroni was not good; that, after refusing to pay such drafts, Mr. Castens called him up frequently over the telephone about the Scholl matter; that such check was made out for him by some one at the bank; that it was given because Mr. Castens said that Scholl wanted to put an attachment on the deposit, and that the bank wanted the money; that he (Ricciardelli) said, "If you are afraid, you can have the money;" that he also gave the bank negotiable warehouse receipts for goods stored, to secure his indebtedness and to borrow more money to pay his debts.

Assuming the correctness of the bank's contention that the cashier made no request for the payment of money on account of such notes, that the payment was unexpected, and that the taking over by the bank of the negotiable warehouse receipts was not to secure the remainder of the bankrupt's obligations, but for the distinct purpose of securing an additional loan, the proven facts show such a situation, beginning with the dishonoring of such drafts and ending with the acceptance of the $1,000, as to force the deduction that Mr. Castens knew of sufficient facts to require him to make inquiry whether such payment would give the bank a preference. As stated, it is sufficient if the facts are "such as would put an ordinary prudent man on inquiry." The payment was, on account of unmatured obligations, an admittedly unusual proceeding. It was made at the close of an unusual series of acts by the payer, known to the payee; i. e., disposing of a large shipment of merchandise before it reached the consignee's place of business, after refusal by the payer to honor the drafts cov-

ering such shipment, and the removing of large quantities of goods from such place of business. It came after repeated interviews between the cashier and the bankrupt, during which the cashier according to (his testimony) told the bankrupt that he "understood Mr. Scholl was going to make some trouble for him," and "I (he) wanted to know where he stood." The check was made out for the bankrupt and signed by him at the bank in the presence of the cashier and a lawyer (not called at the hearing). It was immediately certified by direction of a bank official, an admittedly unusual proceeding, as the deposit drawn upon was in the control of the bank which was to receive the proceeds. It was charged at once against the account. Whether the certification and charge were made before it obtained the indorsement of the wife, and came into the final possession of the bank, does not appear. It was held by the bank after it was charged against the deposit until the first note to be paid thereby fell due, a seemingly unusual course. It was immediately followed by a refusal to advance him any more money, although he offered security of a more tangible character than that represented by the paper to which such payment was to be applied.

The facts of the case, however, negative the idea that the cashier of the bank took no active steps to secure this payment. The testimony of Ricciardelli shows the contrary. The master did not find him unworthy of belief, and I cannot so treat him. Mr. Castens himself testifies that he frequently talked to Ricciardelli about the unpaid drafts; that he asked Ricciardelli to come to the bank on the day such check was given; and that he told him that Scholl was going to make trouble for him on account of such unpaid drafts. This persistent activity on the cashier's part cannot be attributed merely to the fact that the bank had had these drafts for collection. Ricciardelli's indebtedness to it, and the knowledge that he was acting strangely in disposing of his merchandise, were calculated to excite its fears as to Ricciardelli's attitude concerning his obligations to it. Its interests, therefore, rather than the interests of Scholl & Co., whose drafts had been protested, may safely be assumed to have been the motive for Casten's activity (if not anxiety) in keeping in constant touch with Ricciardelli during the few days preceding such payment. That in such interviews the bank sought to secure itself upon the obligations soon to fall due is as probable as it is commendable, and that pressure was brought on Ricciardelli to make such payments is a probability arising from the very persistency of Castens. Ricciardelli's testimony in this respect is strongly corroborated by the probabilities of the situation made up by these interviews and their manifest purpose. But reasonable cause for belief does not require activity upon the part of him who is to be charged therewith. It may, and as a legal proposition must, arise from inactivity, if affirmative action was required.

The occurrences of the two weeks preceding such payment brought home to the bank through its cashier were such as to require it to take affirmative steps to ascertain whether the debtor was solvent. If he was, he had a right to prefer. If not, he had not. Such steps

were not taken. True, the bankrupt was asked "where he stood," and he replied, according to Mr. Castens, that "he was solvent." This is not an unusual response by a failing debtor. None more hopeful than an honest debtor of his ability to pull through a financial crisis; and it is not necessarily a discrediting factor that he alone believes his assets are sufficient to pay all obligations. Such assertions, however, are not always to be taken at their face value, and they seldom are by experienced business men. Actions speak louder than words, and their voice is not to be stilled by mere asservations. The inquirer is not to rest content with mere assertions by the debtor that he is solvent, and perfunctorily making inquiries is no better than making none. His answers should be tested in the ordinary way to elicit the truth, and the inquiry pressed with reasonable intrusiveness. In re John J. Coffey, 19 Am. Bankr. Rep. 149; McGirr v. Humphreys Grocery Co. (D. C.) 192 Fed. 55, 26 Am. Bankr. Rep. 518. If he fails to do this, he is chargeable with knowledge of the facts which such inquiry and testing would have disclosed, and, if such facts would have given him reasonable cause to believe that a preference would result from the transaction, such transaction will be voidable at the suit of the trustee. A bank cashier, than whom, because of exceptional opportunities and facilities to ascertain the financial standing of its customers, none is more competent to correctly weigh assertions made by a customer, is not likely to be misled by such statements; and when, as in this case, he is possessed of the facts which in their lesser effect cast doubt on its accuracy, his duty is to prosecute his inquiries further and not to halt them by the fear that an unsatisfactory disclosure would result. Properly directed inquiries, if instituted by the cashier at the time when he accepted the $1,000 check or at any time between that date and the earlier dates when he learned of Ricciardelli's sale of merchandise at the dock and his removal of large quantities of goods from his store, would have disclosed that he was insolvent, and therefore unable to pay the remaining creditors as large a proportion of his estate as the bank would obtain by taking such check. The unusual in business, as well as in other transactions, challenges the attention, and the failure of the bank to prosecute the prescribed inquiry cannot be permitted to inure to its benefit to the prejudice of the depositor's other creditors of the same class.

On the whole record, the mind is forced to the pronouncement that the bank had reasonable cause to believe that the enforcement of the check for $1,000, given by Ricciardelli, would effect the preference voidable by section 60 of the Bankruptcy Act.

The master's ultimate finding is therefore disaffirmed, and the trustee is entitled to recover such sum, with his costs to be taxed. A decree to this effect may be entered.