ROSENTHAL v. BRONX NAT. BANK et al.

(District Court, S. D. New York. February 26, 1915.)

1. BANKRUPTCY ⬅166—PREFERENCES—BELIEF THAT PREFERENCE WILL RESULT.

Where, before the execution of a chattel mortgage to a bank by a partnership, which was then insolvent, to secure loans previously made by the bank, the bank had refused a further loan, the firm's deposit in the bank had become depleted, the bank had dishonored checks, some of which were for sums as small as $1, and one of the partners had been frequently at the bank to do what he could to satisfy the bank's officials of the firm's solvency, so as to prevent dishonor of its checks, the inference was justified that the bank's officials had reasonable cause to believe that the mortgage would operate to create a preference in the bank's favor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. ⬅166.]

2. BANKRUPTCY ⬅279—PREFERENCES—RECOVERING PROPERTY.

Under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (Comp. St. 1913, § 9644), providing that if a bankrupt shall have made a transfer of any of his property within four months before the filing of the petition, being then insolvent, and the transfer operate as a preference, and the transferee shall have reasonable cause to believe that a preference will be effected, it shall be voidable by the trustee, and he may recover the property or its value, a trustee in bankruptcy could sue to have a chattel mortgage declared an illegal preference and to recover the value of the mortgaged property, though the mortgage had been foreclosed in the state court in a suit brought with the permission of the bankruptcy court.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 419–424; Dec. Dig. ⬅279.]

Suit by Marcus Rosenthal, as trustee in bankruptcy of Benjamin Altman and another, individually and as copartners trading as the Oriental Lace Company, against the Bronx National Bank and others. Decree for plaintiff.

Eugene L. Bondy, of New York City, for complainant.
Williams, Folsom & Strouse, of New York City, for defendants.

HUNT, Circuit Judge. Suit by the trustee in bankruptcy of Benjamin Altman and Max Sokoloff, trading as Oriental Lace Company, manufacturers of laces and embroideries, to have a chattel mortgage given by the bankrupts to the defendant Bronx National Bank on January 12, 1914, and filed January 13, 1914, declared an illegal preference under section 60b of the Bankruptcy Act, and for damages for conversion of the chattels covered by the chattel mortgage, or to pay to the trustee the value of such chattels.

The bank denies all implications relating to the preference charge, and affirmatively pleads that the matters in issue have been finally adjudicated in the state courts of New York in an action wherein the Bronx Bank was plaintiff and the bankrupts and the receiver, who had been appointed in bankruptcy, were defendants; such action having been for the foreclosure of the chattel mortgage assailed in this suit, and which action in the state court proceeded to final judgment for

foreclosure and sale, having been brought in the state court after permission of this court had been obtained.

[1] Upon trial these facts were developed: The Oriental Lace Company had had many banking relations with the Bronx National Bank between the year 1911 and 1912. There was an interruption in such dealings between the latter part of 1912 and May, 1913, when business with the bank was resumed. On May 19, 1913, the bankrupt firm made a signed statement concerning its financial condition to the Bronx National Bank; the statement being made as conditions existed February 1, 1913. It showed the firm had total assets at that time of $37,181, and total liabilities of $8,100, or a net worth of about $29,081. At that time the bank was justified in looking upon the firm as offering a satisfactory business and moral risk. About November 25, 1913, the balance in bank was $500. On November 26, 1913, the bank loaned the firm $2,000, taking two promissory notes, for $1,000 each, one payable January 26, 1914, and the other February 26, 1914. For some time prior to this date the bank had been lending money to the firm, taking as security assignments of customers' accounts; the advances of the bank being about 80 per cent. of the face amount of the accounts so assigned. Some time in December, 1913, Mr. Altman, a member of the firm, applied to Mr. Quinn, vice president and credit man of the bank (with whom the firm had theretofore dealt in its financial matters), for a loan of $5,000. The loan was refused. It was about that time the financial condition of the Oriental Lace Company became complicated. Checks given by the firm were frequently dishonored by the bank for lack of funds, and on December 19, 1913, the balance to the credit of the firm was only $19.83.

Altman, in behalf of his firm, was frequently at the bank, and did what he could to satisfy the officials thereof of a sufficient solvency to prevent dishonor of checks coming in. Quinn had been to the factory of the firm and looked things over, but did not look into the books or financial accounts. Things seemed to drift along until about the —— day of December, when Altman was told by the cashier of the bank that there were 20 firm checks that had been presented, all of which were to be dishonored. Some of these checks had been given by the firm to creditors for merchandise, and some to employés of the Oriental Lace Company. Some were for very small sums—as low as $1. The embarrassments made the situation exigent. The two $1,000 notes heretofore referred to were unpaid, there was no money in bank, merchandise accounts were outstanding, firm checks were being dishonored, employés were owed money, and certain other money due to the bank, which had been secured by the assignment of customers' accounts, was no longer fully protected, because of the apparent inadequacy of the security. Altman asked Quinn for more money, and says that Quinn upon several occasions in December, 1913, and January, 1914, asked him for a statement of the financial condition of the firm, but that he put him off, and never did give it. The firm owed nearly $16,000 and was insolvent, as were the members. Quinn testifies that he did not ask Altman for a financial statement in January, 1914, but that prior to December 18th he did call upon the Dun & Co. Mer-

cantile Agency for a financial report of the affairs of the firm. This report, while dated December 18, 1913, gave the statements of the members of the firm as to the property which the firm owned and the liabilities existing on December 3, 1912, about a year previous, when the assets were given at $40,300 and liabilities at $11,034.57.

Altman says that in January, 1914, he tried to get $5,000 from the bank. Quinn says that Altman made the proposition that the firm would give to the bank a chattel mortgage on the machinery and by making a firm loan of $4,200 they could take up the two $1,000 notes and apply $1,500 on the past-due paper that had been assigned to the bank, and that the bank could keep the balance of the assigned paper not then overdue and could lend the firm $600 to help them out in shipping goods South. Quinn says, also, that Altman told him that he had good orders that he was going to ship to the South, and in two or three weeks would have plenty of money, or something to that effect; that payments were slow, and that that was the reason he needed more money. Finally, as a result of the talks between Altman and Quinn, the firm made a chattel mortgage upon the machinery and motors it owned to the bank, covering all unsecured indebtedness and several hundred dollars in addition. The mortgage was dated January 12, 1914, and filed January 13th. It covered four notes, of $1,050 each, aggregating $4,200. The two unsecured notes of $1,000 each, which were then not due, were returned to the bankrupts as paid. About $1,573 which had been borrowed upon the security of outstanding customers' accounts past due was also paid up, and the difference, amounting to $627, went to the bankrupts and was used by them in paying debts and covering unpaid checks.

On January 16, 1914, a petition in involuntary bankruptcy was filed, and in due course, on March 24, 1914, the firm and the individuals composing the firm were adjudged bankrupts. A receiver was appointed. He took possession of the chattels described in the mortgage and refused to surrender them to the bank. Thereupon the bank brought action against the receiver in the Supreme Court in and for the county of New York and asked for decree of foreclosure. Judgment in favor of the bank was given, and on June 19, 1914, mortgaged chattels were sold at public auction for $1,550.

The preliminary matter of insolvency can be easily disposed of, because it so clearly appears that the firm and each member thereof was insolvent when the mortgage was made that it is unnecessary to dwell on the point. The fair deduction from the evidence is that the financial condition of the firm and its members upon January 12th and 13th was no better than upon the 16th, and when adjudication in bankruptcy was made it was predicated upon the insolvency of the firm and the several copartners. In re Hecox, 164 Fed. 823, 90 C. C. A. 627.

The real question in the case comes to this: Did the bank, at the time of the making of the mortgage or the registration thereof, have reasonable cause to believe that the enforcement of the mortgage would effect a preference? An examination into a state of facts upon which to rest a judgment that a banker had or had not a reasonable cause to

believe that a security he had taken from an insolvent debtor would give him a decided advantage over other creditors ought to be made in the light of the common knowledge that a bank is engaged in the business of extending credit to borrowers, and that a banker may well be presumed to be reasonably careful, not alone in ascertaining the financial condition of those who ask for and obtain loans from his bank, but also in seeing to it that loans made are protected by some sufficient responsibility behind them. If the banker finds that the customer, already in debt to the bank, is running behind, that his transactions indicate that business is falling off, that his balances are becoming depleted, that his demands for additional loans are pressing and frequent, that his overdrafts are the subject of special attention, and if the customer's credit is so overstrained that, as a banker, he will not pay the customer's checks, even for very small sums, it is but fair to conclude that the taking of a chattel mortgage or any other lien by the bank upon all that the debtor has is inconsistent with any rational view other than that the banker had reasonable cause to believe that foreclosure of the mortgage would operate to create a preference in his favor. In re Eggert, 102 Fed. 735, 43 C. C. A. 1; Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99; Collett v. Bronx Bank (D. C.) 29 Am. Bank. R. 454, 200 Fed. 111; Heyman v. Third National Bank (D. C.) 32 Am. Bank. R. 716, 216 Fed. 685.

If these general views are correct, application of them to the facts stated leads to the conclusion that the bank had reasonable cause to believe and is chargeable. Finding, then, that the trustee should prevail, and that a decree should go in his favor for the property or its value, the next point is: What was the reasonable value of the property when transferred? The sale under the mortgage foreclosure realized only $1,550. The evidence shows that it was worth considerably more. The trustee ought not to be bound by the sum realized at the auction sale. A witness who has had much familiarity with machinery such as was included in the mortgage put the value of the whole property at about $7,000; and evidently Mr. Quinn, acting for the bank, was of the opinion that, at the time he took the chattel mortgage, the value was over $4,200. My best judgment is that the evidence fully justifies holding that the chattels were worth $4,200, less the cost of moving them, which the evidence shows would be about $500. Against this value, fixed at $3,700, the bank should be credited with $258, which it had paid to the original vendor of the machines, leaving a balance of $3,442, for which decree may go.

[2] The defense interposed by the bank, that the trustee is bound by the foreclosure judgment obtained in the Supreme Court of the state of New York, is not well founded. The statute expressly makes a preference voidable at the instance of the trustee, and I perceive no reason for denying him the right to conduct this litigation. Belding-Hall Mfg. Co. et al. v. Mercer & Ferdon Lumber Co., 175 Fed. 335, 99 C. C. A. 123; Lovell v. Latham & Co. (D. C.) 32 Am. Bank. R. 191, 211 Fed. 374.

Decree for plaintiff.