(District Court, S. D. New York. July 7, 1925.)

**1. Patents ⬤➝43—Design must possess "novelty" in the eyes of average observers.**

The question of novelty of a design, which will sustain a patent therefor, is a matter of appearance to the eyes of average observers.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Novelty.]

**2. Patents ⬤➝328—Design 43,459, for necktie, held void for lack of invention.**

The Kelner & Worms design patent, No. 43,459, for design for knitted necktie, *held* void for lack of invention.

In Equity. Suit by the Franklin Knitting Mills, Inc., against the Gropper Knitting Mills, Inc. Decree for defendant.

═══════

## In re SHAW.

(District Court, D. New Jersey. August 13, 1925.)

**1. Bankruptcy ⬤➝159—Four elements necessary to make transfer "preference" stated.**

The four elements necessary to constitute a "preference" under Bankruptcy Act, §§ 60a, 60b (Comp. St. § 9644), are (1) transfer from an insolvent to a creditor, (2) its effect to enable such creditor to obtain a greater percentage of his debt than others in the same class, (3) reasonable cause for him to believe that would be its effect, and (4) transfer within four months before bankruptcy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Preference.]

**2. Bankruptcy ⊙═>303(1)—Burden of proof on all elements necessary for preference on trustee.**

The burden of proof on all the elements necessary to constitute preference under Bankruptcy Act, § 60(a), and (b), being Comp. St. § 9644, is on the trustee.

**3. Bankruptcy ⊙═>303(3)—Evidence insufficient to show insolvency of bankrupt when he gave mortgage.**

Relative to mortgage of bankrupt to a creditor being a preference, evidence *held* insufficient to show insolvency of bankrupt when he gave mortgage.

In Bankruptcy. In the matter of Arnold Shaw, bankrupt. On review of referee's order denying petition of Cluett, Peabody & Co., for a certain sum out of the proceeds of the sale of bankrupt's goods and chattels, covered by petitioner's chattel mortgage. Reversed conditionally.

David Bobker, of Newark, N. J., for petitioner.

Jakes J. Murphy, of Jersey City, N. J., in pro. per.

RELLSTAB, District Judge. Cluett, Peabody & Co., a creditor of Arnold Shaw, the bankrupt, on December 11, 1922, obtained a chattel mortgage from Shaw to secure an antecedent debt. This mortgage was recorded the next day. On February 24, 1923, an involuntary petition in bankruptcy was filed against Shaw. The goods covered by the mortgage were sold free and clear of its lien, upon condition that the lien, if any, should attach to the proceeds.

[1] The referee denied the petition of this company (hereinafter called petitioner) for the proceeds, holding that the mortgage was an avoidable preference within the meaning of the Bankruptcy Act (Comp. St. §§ 9585-9656). To constitute a preference under sections 60a and 60b of this act (Comp. St. § 9644), the following four elements are necessary: " 'First, the transfer must be made from an insolvent person to a creditor; second, the effect of such transfer must be to enable one creditor to obtain a greater percentage of his or its debt than others in the same class; third, the creditor receiving it must have had reasonable cause to believe that the effect would be a preference; and fourth, the transfer must have been made within four months prior to the bankruptcy.' " Heyman v. Third Nat. Bank of Jersey City (D. C.) 216 F. 685, 686.

At the close of the testimony taken before the referee, he dictated a memorandum, in which he held that the burden was on the creditor to show that he was "not obtaining a preference over other creditors." Indeed, he went so far as to say that this showing must be beyond a reasonable doubt. The referee also said that he did not think "it is required that insolvency must actually exist at the time the preference is given."

[2] In response to the petitioner's attorney's specific request that the referee determine that Shaw "was solvent or insolvent at the time the mortgage was given," the referee answered, "I think the burden of proof is upon you." To the attorney's response, "We have endeavored to show that he was solvent," the referee replied, "No; what I have held does not make it necessary to adjudicate upon that question." In so ruling, the referee clearly erred. The burden of proof on all the four mentioned elements is cast upon the trustee. Heyman v. Third Nat. Bank of Jersey City (D. C.) 216 F. 688, 689. See, also, Collier on Bankruptcy (13th Ed.) p. 1328, and cases cited under notes 302 and 303.

At the time of the first hearing on this review, I called attention to this erroneous attitude of the referee, and the case was remanded to permit the trustee to take further testimony, if he so desired. Additional testimony was taken, but this was confined to showing that on October 5, 1922, a little more than two months before the mortgage was obtained, another creditor of Shaw secured a judgment against him for about $158.05, and that, upon execution issued on such judgment, a sale of part of Shaw's goods was made on January 17, 1923. This was about six weeks after the petitioner's mortgage was executed. The record before me does not definitely show that this judgment was wholly paid, but the inference is that it was satisfied. In the referee's conclusions, filed subsequent to the taking of this testimony, he makes no reference to the burden of proof. After reviewing the testimony, he concludes:

"In this case it seems to me satisfactorily proven that the previous experience which the creditor had had with the bankrupt in taking extension notes, receiving some checks in payment thereof and others upon which payment was stopped, or the notes returned worthless, were sufficient to at least warn him that the bankrupt's credit was not good. In view of these experiences, I cannot see how the creditor could have relied upon the bankrupt's statement to R. G. Dun & Co. concerning his interest in the real estate. It would seem most unusual that with this equity he

would permit his checks to be dishonored. The refusal of the claimant to extend further credit to the bankrupt is an indication to my mind that he was extremely doubtful of the bankrupt's financial responsibility. With all these circumstances before the chattel mortgagee, it seems to me that he was bound to go beyond a mere cursory examination to satisfy himself of the solvency of the bankrupt or that the bankrupt was entitled to further credit, and that the true situation would have been revealed by slight investigation. I am therefore constrained to deny the creditor's petition, and to permit the trustee to file a petition for the return of the $500 paid by the bankrupt on account of this mortgage."

Of the four stated requisites to constitute an avoidable preference, the fourth is established, and the second is not controverted.

As to the first and third requisites—(a) insolvency at the time of the execution of the mortgage, and (b) reasonable cause to believe that the effect of giving it would be a preference—the commercial relations of the parties within a reasonable time prior thereto, as well as the transactions resulting in the giving of the security, are material in reaching a conclusion. Shaw had been dealing with the petitioner for some time—the record does not show the period, even approximately. He had become behind in his payments. In 1922 his indebtedness to the petitioner grew from $232.09 on May 12th to $1,546.10 on August 21st.

On September 15th of the same year, about three months before the giving of the mortgage, Shaw gave to R. G. Dun & Co., a commercial agency, a statement of his assets and liabilities, which statement disclosed a surplus of $3,960, so far as his store assets were concerned. In addition, it asserted that he had a one-third interest in the equity of an apartment house "held by the estate of his mother," which interest he valued at $23,333, making his net worth $27,283.

This statement, to the knowledge of the commercial agency, was not based on an inventory recently theretofore made. At the time the mortgage was executed, a copy of the statement was received by the petitioner, and was in the custody of the attorney to whom the account against Shaw had been forwarded for collection. While the copy was in petitioner's possession, three checks totaling $455.85, given by Shaw on account of his indebtedness, were refused payment, and about October 30, 1922, petitioner refused to ship him any more goods.

The attorney above referred to had represented the petitioner a number of years. On its behalf he had secured a judgment against the bankrupt about a year previous to the giving of the mortgage. This judgment, and the claims of Shaw's other creditors, were settled by his giving promissory notes under an extension of time granted by them to him which notes were subsequently paid in full.

Upon receipt of the petitioner's claim against Shaw, this attorney wrote to him in relation thereto, and, not receiving any response, he sent a messenger to him, whereupon he came to the attorney's office. The attorney, in the presence of G. R. Sargeant, the credit man and representative of the petitioner, told Shaw he "was authorized to bring suit, but did not want to press him." At the same time he interrogated him about his assets and liabilities, and elicited from him the following information: That, as to his business, his assets were about $5,000, and his debts between $2,000 and $2,500; that he was solvent but short of cash; that business was not what he expected; that he had not taken in any money, and therefore could not pay what he owed petitioner; that he had an equity in his mother's estate, worth about $25,000; that the property was about to be sold; and that when he received his money he would pay petitioner and others. The attorney thereupon told Shaw that he "would withhold bringing suit if he would give me [him] some means of assuring Cluett, Peabody that their claim would be protected, and they would be paid out of his mother's estate," and suggested that he give an assignment of his interest in that estate. This Shaw refused to do. The attorney thereupon "asked him if he would execute a chattel mortgage, in view of the fact that he was perfectly solvent," and that, "if he would give such chattel mortgage I [he] would hold off bringing suit and give an extension of time." Shaw thereupon executed the mortgage.

He testified that it was his understanding that, if he gave the mortgage, the petitioner would give him further credit. Sargeant, on the other hand, testified that this was not so. Shaw further testified that the day after signing the mortgage he sent an order to the petitioner, and that Sargeant "complained about the size of the order and said, yes; he had agreed to give some credit, but the order I phoned in was too large," and from that time he received no credit from the petitioner.

To a question put to Sargeant by the trustee, viz. "Did you know the chattel mortgage would give you a preference over other creditors?" he answered, "I thought it would protect us"; and to the following question, "And give you an advantage over other creditors?" he replied, "Possibly."

The attorney testified that he was satisfied that Shaw's assets exceeded his liabilities by about $25,000; that he knew he was slow in paying his obligations, but that he always took care of them; that he believed Shaw was satisfied he was solvent, and that the petitioner was not being preferred, otherwise he would not have taken the mortgage. Being interrogated as to the advantages his client was to get by the mortgage, he said that when it came due they could sue Shaw and obtain interest upon payment, and that it would indicate to him that it would have to be paid; that Shaw told him that if suit was withheld he would then be able to pay all but two or three small creditors, so that his client would be the only creditor.

[3] If insolvency at the time of giving this mortgage were established, the recited occurrences would afford a strong basis for the conclusion that the petitioner had knowledge of sufficient facts to put it to a greater inquiry than it actually made to ascertain whether the taking of the mortgage would not amount to the prohibited preference; but, in my judgment, insolvency at that time has not been established. Both of Shaw's statements as to his financial condition—the one to the commercial agency, and the subsequent one to petitioner's attorney and credit man when he was asked to give security —are to the contrary effect. True, the bankrupt's statements are not binding upon the trustee, but no evidence was offered to show that they were untrue at the time made, or that in fact he was insolvent at the time the mortgage was given.

As noted, less than three months elapsed between the recording of the mortgage and the filing of the involuntary petition in bankruptcy. The statements of assets and liabilities show that Shaw's business was not extensive, and it would seem that the trustee ought to have been able to trace back the bankrupt's financial and commercial transactions and ascertain his financial condition at the time the mortgage was given. But whether this is so or not, without a showing of insolvency at the time of the transfer, a preference under the Bankruptcy Act is not established. Heyman v. Third Nat. Bank of Jersey City, supra.

This exposition calls for a reversal of the order brought for review. However, as it is possible that the trustee was misled by the referee's original holding that the burden of proof was on the petitioner, this court will withhold the judgment for a reasonable time to permit the trustee to determine whether he is able to assume this burden. If the trustee shall fail to apply for an order remanding the cause for further testimony within four weeks (the time is made that long as we are now in the summer recess), counsel for the petitioner may submit a decree to reverse the order under review.

NOTE.—The trustee did not apply for an order remanding the cause to take additional testimony, and the order under review was reversed.